Filed 12/30/13  P. v. Hernandez CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B244259 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. SA061371) |
| v. | |
| GIOVANNI HERNANDEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael E. Pastor, Judge.  Affirmed.

John Steinberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and Eric J. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted Giovanni Hernandez of first degree murder (count 1; Pen. Code, § 187, subd. (a));[1] four counts of attempted premeditated murder (counts 2-5; §§ 664 & 187, subd. (a)); and shooting at an occupied motor vehicle (count 6; § 246). As to each count, the jury found that Hernandez personally discharged a firearm causing great bodily injury or death (§ 12022.53, subd. (d)) and committed the crime for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)). The trial court sentenced Hernandez to a total term of 50 years to life in state prison.[2] We affirm.

## FACTS

### The Underlying Shooting

In 2006, the Culver City Boys gang and Sotel 13 gang were rivals. In the months leading up to July 2006, Hernandez began saying to people, including his friend Edy Hernandez,[3] and a gang unit police officer, that he was a member of the Sotel 13 gang.

In the early morning hours of July 30, 2006, Los Angeles Police Department (LAPD) Officer Irene Castro and her partner responded to the area around Sawtelle and National Boulevards after receiving a radio call regarding shots fired. On arriving at the scene, Officer Castro saw a green Mustang with a shattered rear window and a bullet hole in the front windshield. Other officers at the scene stated that the victim, Jon Carillo, had already been transported to the hospital. Officer Castro and her partner went to the hospital to ask Carillo if he knew who shot him. Carillo was being treated and conscious and talking to doctors and hospital staff, but he did not answer Officer Castro's questions. Hospital staff informed Officer Castro that Carillo had sustained gunshot wounds to the knee, forearm and the back. Carillo was a member of the Sotel 13 gang.

In the opinion of a police gang expert who testified at Hernandez's trial, Carillo had been "grandfathered" into the Sotel 13 gang through relatives, and was "a 'shotcaller'

---

[1]     All section references are to the Penal Code except where noted otherwise.

[2]     Hernandez was 21 years old on the date of sentencing.

[3]     Not meaning any disrespect, but for easy reference, we refer to Edy Hernandez as Edy.

for his clique" in the gang.  He was probably also one of Hernandez's "mentors" in the gang.  An attack on a gang's shotcaller would be a "major, major insult" to the gang's other members.

### The Shooting Incident by Hernandez

Felicia P. lived with her uncle and other relatives in an apartment on McLaughlin Street.[4]  The murder victim, Gary O., was Felicia's boyfriend, and he sometimes stayed at the apartment.  Felicia knew Gary O. and Robert C. to be members of the Culver City Boys gang.  Felicia's cousin, Felix P., Jr., associated with members of the Sotel 13 gang.  Felicia and Hernandez were friends.  Felicia did not know "for sure" whether Hernandez was a gang member.  Felicia was also friends with shooting victims Carillo, Jose Z., and Oscar M.  She knew all three to be Sotel 13 gang members.

On July 30, 2006, Felicia woke up to a phone call from her friend "Christine."  Christine told Felicia that Carillo had been shot.  One of Felicia's first thoughts was that a rival gang member must have shot Carillo, possibly "Santa Monica," a main rival of the Sotel 13 gang.  Later, Felicia received phone calls from both Oscar M. and Jose Z.  In one call, Oscar casually asked Felicia who else was in the apartment with her.  Felicia told Oscar that Gary and Robert were in the apartment.  In other calls, Jose and Oscar both wanted to know what Robert and Gary would be doing that day, and Felicia told Jose and Oscar that Robert and Gary would be leaving the apartment soon to go to the beach.

At about 11:20 a.m. on July 30, 2006, Vanessa G., her sister Sophia G., and their friends Victor G. and Rudy D. drove to Felicia P.'s apartment where Gary O. and Robert C. were staying.  Rudy was driving.  Vanessa and the others parked and waited outside of the apartment, and Vanessa used her phone to call Gary and let him know that they had arrived.  The group waited in Vanessa's car for about 10 minutes before Gary headed down from the apartment.

---

[4]  Felicia testified at a first trial in late 2010.  She did not testify at a second trial at which Hernandez was convicted.  Her testimony from the first trial was read to the jury at the second trial.

Gary got into the car in the rear passenger seat behind Rudy D. Sophia told Gary to call Robert C. and tell him to hurry. At about that same moment, a four-door car drove up from behind and stopped alongside the driver's side of the car in which Vanessa and the others were waiting.[5] Vanessa believed there were four males in the other car; she saw Hernandez seated in the rear passenger seat and heard him ask, "Where are you guys from?" Vanessa understood the question to be gang-related. Sophia saw and heard Hernandez ask, "Where are you fools from?" Vanessa and Sophia immediately told Rudy to drive away.

As Rudy tried to drive away, Hernandez began shooting at the people in Vanessa's car. He fired the gun at least five times. Vanessa ducked until she heard the other car drive away from the scene. Rudy was shot and crashed the car into a parked car. Once the car came to a rest, Vanessa asked, "Is everyone okay?" Gary said he had been shot. Vanessa got out of the car, went to the driver's side, and opened the door. Rudy had been shot in the head and appeared to be dead. Vanessa tried to speak to Rudy, but he did not respond. His head was resting on the steering wheel. Gary was clutching his own stomach, and Vanessa dragged him out of the car to the curb. Sophia tried to speak to Gary, but he only made noises in pain. Victor G. had also been shot, but was able to get out of the car on his own. By then, Robert C. had come outside, and Vanessa told him to call the police. Sophia began shouting out for someone to call an ambulance. At trial, Vanessa and Sophia both identified Hernandez as the shooter. Both testified they were "sure" that Hernandez was the shooter.

William K. was returning to his home on McLaughlin Street and saw a light green car blocking where he wanted to pull in. William parked his vehicle, approached the car and asked the driver to pull forward. Three men who looked Hispanic and had short hair were in the car. Two were seated in the front and one in the rear; the doors appeared to be ajar. The driver nodded in response to William's request, but made no eye contact. As soon as the car pulled forward and William pulled his car into park, he heard what he

---

[5]     Sophia testified the car was "like – I want to say blue gray tarnished like old car . . . ." Other witnesses saw the shooter's vehicle as faded brown or maroon.

4

thought might be firecrackers. William looked down the street and saw a man standing on the street. The man fired two gunshots into a car. The man jumped back into the car that William had approached seconds earlier, and the car drove off.

Theodore R. and his friend were seated in his friend's truck in front of his apartment building on McLaughlin Street when he heard sounds that at first sounded like fireworks. At about the same time, Theodore's friend said, "Hey, they are shooting over there." Theodore looked in the direction his friend had indicated and saw a "double parked" car, which he thought was "probably [a] late 80's, early 1990's" Japanese or Asian compact, either a "Mazda or Toyota or something like that." Theodore heard four or five more gunshots, and saw an arm extending from the front passenger side window of the car; he was about 150 feet from the car and was not sure exactly which window. Immediately after the shots were fired, the car came speeding towards the area where Theodore and his friend were parked. Theodore's friend said they should both duck, and they both did. As they were down, it sounded like the car stopped next to them. When they heard neighbors outside on the street, they thought it was safe to sit up and get out of the truck. Theodore walked in the direction of the shooting. He told one of the victims that help was on the way. Theodore walked toward a car that was still running and pressed up against a parked car. He saw gunshot wounds to the driver's head. Theodore figured the driver was dead and tried to help the other victims.

Blake H. lived in the area and heard the gunshots. He ran outside to see what had happened and saw a four-door maroon Toyota or Honda speeding away from the scene. Blake thought he saw three men in the car, as well as a puff of smoke coming from where the car seemed to have sped away. He believed the first two characters on the license plate were "2M." Blake provided this information to the police.

Police responded to the scene. An ambulance transported Gary O., Victor G., and Rudy D. to the hospital. Vanessa tried to speak with the police and tell them what had transpired, but she was so upset that she could barely get out any words. Sophia also spoke to the police. Gary died as a result of internal injuries caused by the gunshot wound to his abdomen. Rudy suffered permanent brain injuries which cause seizures.

5

After the shooting, Hernandez called his friend Edy. He told Edy to turn on the television because the news was covering something that had just happened in the neighborhood. Edy turned on the news and saw the coverage of the shooting, which included information that Gary O. had died.[6]

About two weeks after the shooting (August 14, 2006), Vanessa G. and Sophia G. both identified Hernandez's photographs from six-pack arrays. In March 2008, Vanessa G. identified Hernandez from a live lineup.

### The Criminal Case

In November 2006, the People filed an information charging Hernandez with murder (count 1; § 187, subd. (a)); four counts of attempted premeditated murder (counts 2-5; §§ 664 & 187, subd. (a)); and shooting at an occupied motor vehicle (count 6; § 246). As to all counts, the information alleged that Hernandez personally discharged a firearm causing great bodily injury or death (§ 12022.53, subd. (d)) and that he committed the offense for the benefit of a criminal street gang (§ 186.22).

At a first trial in late 2010 into 2011, a jury was unable to reach verdicts. The case was tried to a jury a second time in spring 2012. In June 2012, the jury returned verdicts finding Hernandez guilty on all counts as stated at the outset of this opinion. The trial court sentenced Hernandez to a total aggregate term of 50 years to life as follows: on count 1 (first degree murder) a term of 25 years to life, plus a consecutive term of 25-years-to-life for the personal firearm use enhancement; on counts 2 through 5 (four counts of attempted premeditated murder) concurrent terms of 15 years to life with 25 years to life for the personal firearm use enhancements; and on count 6 (shooting at a motor vehicle) a concurrent term of 15-years to life with 25 years to life for the personal firearm use enhancement.

---

[6] Police arrested Hernandez on August 24, 2006, and seized a cell phone in his possession. At trial, evidence from the cell phone showed that 30 calls were made to or from the phone between midnight and 7:54 a.m. on July 30, 2006. Other phone records showed Hernandez's phone number was on phones of known Sotel 13 gang members. Four phone calls were made to Hernandez's phone between 11:24 a.m. and 11:35 a.m. on July 30, 2006 (the time of the shooting); all four calls went to voicemail.

6

Hernandez filed a timely notice of appeal.

## DISCUSSION

### I.    Gang Evidence

Despite the fact that he was charged with a gang allegation, Hernandez contends his convictions must be reversed because the trial court allowed the prosecution to admit photographs of him with firearms and to question a number of witnesses regarding his gang status. Hernandez argues this "cumulative and highly inflammatory evidence" was inadmissible on several grounds and that its repeated use at trial violated his due process rights under federal and state constitutional standards. We are not persuaded.

### *The Evidence*

1.    Prosecution Witness Edy Hernandez

The prosecution first sought to introduce gang-related photographs of Hernandez during the testimony of Edy. As noted above, Edy testified that Hernandez made statements suggesting that he had been involved in the shooting. Edy further testified that he and Hernandez were friends. Edy admitted he was associated with the Sotel 13 gang, but was not a member of the gang. When the prosecutor asked Edy whether or not Hernandez "claimed Sotel," Edy answered that, in 2006, he had told detectives that Hernandez "claimed Sotel." In this vein, Edy identified a photograph of Hernandez with other gang members in Mar Vista Park.

On cross-examination, Edy testified that, in 2006, neither he nor Hernandez had actually been "jumped" into the Sotel 13 gang. On redirect examination, Edy reiterated his testimony that, in 2006, Hernandez "claimed Sotel." Edy explained: "He was saying he was from [Sotel 13]. That's all I remember. I don't know if he was jumped in or anything like that." The prosecutor then showed Edy a photograph of Hernandez with others whom Edy recognized as Sotel 13 gang members. Hernandez was "throwing" a Sotel 13 gang sign in the photograph. The prosecutor also asked Edy if he had ever seen Hernandez with a gun? Edy answered, "No." The prosecutor then asked, "If you did, would that change your opinion that maybe he is a gang member?" Edy answered, "A little, yeah, more."

7

2.    The Gang Expert

The prosecution's gang expert, LAPD Officer Agustin Lopez, testified about his familiarity with Hispanic gangs, their hierarchy, how one becomes a member of a gang, and the strong likelihood of retaliation by violence in the event of violence perpetrated against their own gang by a rival. Officer Lopez testified the primary activities of Sotel 13, about which he is an expert, include murder, attempted murder, robbery, grand theft auto, vandalism and gun possession. He indicated that Hernandez admitted he had been jumped into Sotel 13 with the nickname of "Gio" and a moniker of "Minor." He opined the Culver City Boys were rivals of Sotel 13 and that based on a hypothetical arising from the facts of the shooting in this case, that it was committed on behalf of a gang in retaliation against rivals. The prosecutor questioned Officer Lopez about the photographs of Hernandez and other Sotel 13 gang members with firearms and throwing gang signs. During the course of these exchanges, Officer Lopez testified that Hernandez was a "soldier" in the gang.

3.    Defense Witness J.H.

Hernandez's sister, J.H., testified as a defense alibi witness. On direct examination, she testified that Hernandez's parents were growing concerned in summer of 2006 that he was hanging out in the park with Sotel 13 gang members. She testified that Hernandez participated in soccer tournaments and was enrolled in a confirmation program at their church. She did not offer an opinion whether he was a gang member.

On cross-examination, J.H. reiterated that Hernandez was "hanging around with gang members a lot that summer." When the prosecutor asked, "Do you think your brother was a gang member?" J.H. answered, "No, he was not." The prosecutor proceeded to show J.H. the photographs of Hernandez firing a weapon, holding a weapon in the presence of other gang members and throwing gang signs. The prosecutor asked J.H. if the photographs changed her opinion whether Hernandez was a gang member. J.H. answered, "My opinion stays."

8

4.     Other Defense Witnesses

The prosecutor used the photographs again during the testimony of Hernandez's father, mother, and brother, all who testified as defense alibi witnesses. The scenario was largely the same as to all three witnesses — all testified that Hernandez had been hanging out with gang members leading up to the time of the shooting, but none offered an opinion as to whether Hernandez, in fact, was a gang member. Then, on cross-examination, the prosecutor asked about their knowledge of Hernandez's gang membership, and showed them the photographs, and asked whether the photographs changed their opinions about Hernandez's gang membership.

Hernandez's father, testified on direct examination that Hernandez was hanging out with people his father did not approve of in Stoner Park. He did not offer an opinion whether Hernandez was a gang member. On cross-examination, Mr. Hernandez testified that he often went to Stoner Park to pick up Hernandez. He told Detective Lumbreras that Hernandez was hanging out with gang members. The prosecutor asked if he had ever seen Hernandez with a gun. He answered, "No." The prosecutor then asked if he believed Hernandez was a gang member. When he responded, "No, I don't think so," the prosecutor showed him a photograph of Hernandez holding a gun and asked whether it changed his opinion. Mr. Hernandez responded, "I already knew he was hanging out with those guys. But I know him, and he lived at home. So I don't believe he was a gang member." The prosecutor then showed him a photograph of Hernandez shooting a gun and asked, "How do you react to seeing your son practicing shooting a weapon like that? Does that change your mind at all that maybe he was a gang member?" He responded, "No."

Hernandez's mother testified on direct examination that she told Hernandez not to hang out in the park because a police officer told her gang members congregated there. She saw him in the park with gang members. She testified that Hernandez was involved in soccer and confirmation classes. She did not offer an opinion whether Hernandez was a gang member.

On cross-examination, Mrs. Hernandez testified that Hernandez went to the park every day in the summer of 2006. She threw away some of his clothes because he was dressing like a gang member. The prosecutor asked if the police officer who warned her not to allow Hernandez to go to the park also told her that Hernandez was a gang member. Mrs. Hernandez responded that the officer did not assert Hernandez was a gang member, but counseled her. The prosecutor showed Mrs. Hernandez a photograph of Hernandez with other gang members throwing gang signs and asked whether "he looked a little bit like a gang member?" The prosecutor showed her a photograph of Hernandez holding a gun and asked whether he was allowed to go shooting. She responded that he was not. The prosecutor asked if the photograph changed her opinion whether Hernandez was a gang member. She responded, "My son is not a gang member."

Hernandez's brother, S.H., Jr. testified on direct examination, that Hernandez frequented Stoner Park and was "hanging around with people . . . that might have been just the wrong crowd . . . I think they were gang members." He did not offer an opinion whether Hernandez was a gang member.

On cross-examination, the prosecutor showed the witness photographs of Hernandez throwing gang signs , and asked whether the photographs changed his opinion that "maybe my brother was a gang member and we didn't know it." The witness responded, "No, I didn't think he was a gang member." The prosecutor then showed the witness photographs of Hernandez holding a gun and shooting a gun , and asked if the photographs changed his opinion. He responded, "It is disappointing. It is something I wasn't aware he was doing."

*Analysis*

Hernandez argues his affiliation with the Sotel 13 gang "was not reasonably subject to dispute" and that the prosecution established his relationship with the Sotel 13 gang with evidence independent of the photographs of him holding and shooting firearms. He contends the prosecution overused the gang evidence to show his "bad character" and his "propensity to commit crimes," resulting in a denial of his federal constitutional right to due process. His arguments rely on cases addressing claims that

10

trial courts erred in admitting gang evidence (see, e.g., *People v. Albarran* (2007) 149 Cal.App.4th 214, 223-232 (*Albarran*)), or in admitting cumulative evidence (see, e.g., *People v. Williams* (2009) 170 Cal.App.4th 587, 611 (*Williams*)).

To prevail on a claim that he was denied a fair trial or due process of law by the admission of gang evidence, Hernandez must show "admission of the evidence was erroneous, and that the error was so prejudicial that it rendered his trial fundamentally unfair. [Citation.]" (*People v. Garcia* (2008) 168 Cal.App.4th 261, 275.) "'Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must "be of such quality as necessarily prevents a fair trial." [Citations.] Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose.' [Citation.] 'The dispositive issue is . . . whether the trial court committed an error which rendered the trial "so 'arbitrary and fundamentally unfair' that it violated federal due process." [Citations.]' [Citation.]" (*Albarran, supra,* 149 Cal.App.4th at pp. 229-230, fn. omitted.)

As has been noted, the information charged Hernandez with counts for murder, attempted murder, and shooting at a motor vehicle, and included allegations as to all of the counts that he personally discharged a firearm causing great bodily injury or death (§ 12022.53, subd. (d)) and that he committed the crimes for the benefit of a criminal street gang (§ 186.22). The prosecution had the burden of proving the elements of the substantive offenses, and the ancillary allegations, beyond a reasonable doubt. It follows, that the prosecution was allowed to introduce evidence to satisfy its burden of proof as to all aspects of the case, including the gang allegations.

In order to prove the gang allegation, the prosecution must prove that the felonious conduct was "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1).) "'In addition, the prosecution must prove that the gang (1) is an ongoing association of three or more persons with a common name or common identifying sign or symbol; (2) has as one of its primary activities the commission of one or more of the criminal acts enumerated in the statute; and

11

(3) includes members who either individually or collectively have engaged in a "pattern of criminal gang activity" by committing, attempting to commit, or soliciting *two or more* of the enumerated offenses (the so-called "predicate offenses") during the statutorily defined period. (§ 186.22, subds. (e) and (f).)' (*People v. Gardeley* [(1996)] 14 Cal.4th [605,] 616-617.)" (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1047 (*Hernandez*).)

Given the burden of proving this allegation, the trial court did not err in allowing the introduction of gang photographs. In addition, evidence of gang membership is admissible to help prove identity, motive, specific intent or other issues pertinent to a charged crime. (*Hernandez, supra,* 33 Cal.4th at p. 1049.) Hernandez's arguments that the gang expert could not be questioned about the basis for his opinions, including being questioned about photographs showing Hernandez's gang-related activities, are simply not persuasive.

The prosecutor's questioning of Hernandez's family and friends was also appropriate. There is no rule that limits the proof of a gang allegation to the testimony of a gang expert. Indeed, a gang expert's testimony, standing alone, is often challenged as insubstantial. The testimony from defense witnesses that Hernandez was not a gang member was properly rebutted by the evidence presented by the prosecutor.

The evidence was also properly admitted to impeach the civilian witnesses. Evidence that bears on the credibility of a witness's testimony is relevant and admissible (Evid. Code, § 785; *People v. Abel* (2012) 53 Cal.4th 891, 924-925) and trial court's are afforded "considerable latitude" in allowing evidence that goes to credibility (*People v. Winston* (1956) 46 Cal.2d 151, 157). A trial court has discretion to admit or exclude relevant impeachment evidence under Evidence Code section 352. (*People v. Clark* (2011) 52 Cal.4th 856, 932.) Because of the "'great variety of factual situations in which the issue arises,'" the court's discretion is as broad as needed to deal with each such situation, and is ordinarily upheld. (*Ibid.*) A court abuses its discretion when its ruling is arbitrary or capricious or unreasonable, all circumstances considered. (*People v. Branch* (2001) 91 Cal.App.4th 274, 282.)

During cross examination, Edy testified that neither he nor Hernandez had actually been jumped into the Sotel 13 gang. This was plainly a tactical decision by defense counsel to try to undermine proof of Hernandez's identity as the shooter (because, as the trial court accurately observed, the shooting had earmarks of a gang shooting), as well as to challenge the gang enhancement allegations. As for the family member defense witnesses, they all testified that they had known Hernandez was "hanging around with the wrong people" leading up to the time of the shooting, but did not acknowledge nor deny that he was a gang member.

Having made the tactical decision to attack the gang aspects of the case against Hernandez, the prosecutor was permitted to present evidence attacking the credibility of those witnesses for impeachment purposes. (Evid. Code, § 785.) The trial court did not act unreasonably in allowing the prosecutor to examine witness Edy and to cross-examine Hernandez's sister and mother regarding their knowledge of Hernandez's gang membership, and, in doing so, using the photographs showing his gang activities, subject to the protections of Evidence Code section 352. And such rulings under Evidence Code section 352 ordinarily do not infringe on a defendant's due process rights. (*People v. Falsetta* (1999) 21 Cal.4th 903, 919-922.) The cases cited by Hernandez do not support the proposition that a defendant has a due process right to shield a witness from gang evidence that impeaches his or her credibility, where, as here, the evidence is relevant to the witness's credibility.

Two of the defense witnesses went further — Hernandez's sister and mother testified that he was involved in soccer, and was enrolled in a confirmation program at their church. This too was plainly a tactical decision designed to show Hernandez's "good character," and to implicitly suggest he would not have been involved in a gang shooting. Once Hernandez' good character was put in issue, the prosecutor was free to challenge that characterization. (Evid. Code, § 1102, subd. (b).)

With regard to Hernandez's father and brother, neither of whom offered "good character" testimony, Hernandez claims the evidence was only offered to show Hernandez's propensity to commit crimes. Not so. As we have noted, the evidence was

13

relevant to prove the gang allegation; it was also relevant to the motive and identity of the shooter. We agree with Hernandez that the use of gang evidence to show criminal propensity may be problematic. (See *Albarran, supra*, 149 Cal.App.4th at p. 228.) But Hernandez's reliance on *Albarran* in support of his position on this case is misplaced in this case.

Albarran was found guilty of attempted murder, shooting at an inhabited dwelling and attempted kidnapping for carjacking. As to each count, a gang enhancement allegation was found true. Thereafter, a motion for new trial was granted as to the gang allegations, but the trial court found sufficient evidence to support each of the underlying convictions. On appeal, Division Seven of this court determined that the trial court should have granted a new trial as to the underlying convictions as well because the gang evidence, properly admitted to prove the gang allegations which were subsequently subject to the new trial order, prejudiced his trial on the underlying charges. (*Albarran, supra,* at pp. 230-231.) Obviously, this case is different because the gang allegations were not subject to order for new trial.

Hernandez also argues the repeated use of the gang evidence created a problem of cumulative evidence. But his trial did not involve a situation where a prosecutor "over-proved" the case against the defendant, creating a problem of cumulative, prejudicial evidence. (See *Williams, supra*, 170 Cal.App.4th at pp. 610-611.) The prosecutor did not call a list of witnesses, each of whom presented in turn a "repeat of previous evidence." (*Id*. at p. 610.) Hernandez's trial did not involve a situation where "[the] sheer volume of evidence extended the trial — and the burden on the judicial system and the jurors — beyond reasonable limits . . . ." (*Id*. at p. 611.) Here, the prosecutor did no more than challenge the credibility of defense witnesses as they testified, as is the right of every party at trial.

Hernandez's arguments on appeal do not persuade us to find a constitutional due process error. The gang evidence was properly admitted for a purpose other than showing criminal propensity. In summary, we find Hernandez's case unlike *Albarran, supra*, 149 Cal.App.4th 214, where irrelevant, prejudicial gang evidence regarding such

14

matters as the Mexican mafia was admitted to no discernible end other than to poison the jury. We also find Hernandez's current case unlike *Williams, supra*, 170 Cal.App.4th 587, where there was continuous drumbeat of gang evidence to no discernible end other than to poison the jury. The overwhelming use of gang evidence at Hernandez's trial had a legitimate purpose other than causing the jury to convict based on gang animus rather than the evidence.[7]

Finally, Hernandez contends his convictions must be reversed because the trial court erred in allowing the prosecutor to use gang evidence to impeach the testimony of the defense lay witnesses. Specifically, he argues that the use of gang evidence to impeach a witness should not be allowed when the evidence is more prejudicial than probative. He cites cases such as *United States v. Tsosie* (10th Cir. 2008) 288 Fed. Appx. 496, 499 (*Tsosie*). We are not persuaded to reverse.

In *Tsosie*, the defendant was convicted of assault offenses on lands within, in the language of the federal statutes, "Indian country." During trial, "the government cross examined three defense witnesses with regard to their gang affiliation." (*Tsosie, supra*, 288 Fed. Appx. at p. 499.) The 10th Circuit Court of Appeals affirmed, applying this rule: evidence of gang affiliation is admissible for proving a witness's bias when a proper foundation is laid to show the witness's gang affiliation, and the evidence is not more prejudicial to the defendant than probative to an issue at trial. (*Ibid*.)

The Court of Appeals explained: "The district court was within its discretion in allowing [the] questioning [on gang affiliation]. First, the government met its burden of laying a proper foundation by showing Tsosie and the three defense witnesses (Derrick Ross, Adrian Beletso, and Elton Beletso) were members of the same gang- *viz.,* the West

---

**7** In so far as Hernandez contends his convictions must be reversed because the opinions of lay witnesses as to whether he was a member of the Sotel gang were improperly admitted at trial, his argument falters. If a lay witness, without any personal knowledge, offered an opinion that a defendant was a gang member, and the lay witness opinion was used to prove a gang aspect or gang enhancement involved in a case, we might potentially see an issue. But this is simply not the context for the use of the lay witnesses' opinion testimony at Hernandez's trial, as we have shown.

Side Crips. . . . [¶] Nor was the gang evidence unduly prejudicial under [Federal Rules of Evidence,] Rule 403. Evidence that the defense witnesses were biased in favor of their fellow gang member was highly probative. [See *U.S. v. Keys* (10th Cir. 1990)] 899 F.2d at 987-88; [*U.S. v. Abel* (1984) ] 469 U.S. at 52 . . . ('A witness' and a party's common membership in an organization . . . is certainly probative of bias.') . . . . Although gang membership can be prejudicial, the district court mitigated this problem by giving the jury a limiting instruction which said, 'Evidence of possible gang membership may be considered by you for the sole purpose of evaluating the credibility of witnesses Derrick Ross, Elton Beletso, and Adrian Beletso and not for any other purpose.' . . . This limiting instruction diminished any prejudicial effect of the evidence. [(*Abel*, 469 U.S. at p. 55 . . . (noting court's offer to give limiting instruction 'ensure[d] that the admission of this highly probative evidence did not *unduly* prejudice' defendant).)]

Here, at Hernandez's trial, the use of gang evidence was probative of the witnesses' credibility. It provided a basis for the jurors to assess testimony that Hernandez was a soccer-playing, church-attending kid. We do not find it unduly prejudicial. The *Tsosie* opinion is largely a discussion of the rules of federal evidence, which mostly correspond with an Evidence Code section 352 analysis under state evidence law; the opinion is only marginally helpful is considering Hernandez's due process claim on appeal. For all the reasons discussed above, we do not view Hernandez's trial as fundamentally unfair based on the presentation of the gang evidence in the context of impeachment.

For all of the reasons stated above, we do not find that the gang evidence, viewed as a cumulative matter, resulted in a denial of due process. The evidence was properly presented to support the gang expert's testimony and to impeach witnesses.

## II.     Prosecutorial Misconduct

Hernandez contends his convictions must be reversed based upon prosecutorial misconduct. Specifically, Hernandez argues the prosecutor engaged in wrongful cross-examinations of witness Edy and Hernandez's family member defense witnesses for the sole purpose of presenting inflammatory evidence of his gang membership and activities.

For the reasons explained above in addressing and approving of the use of gang evidence, we reject Hernandez's argument that the prosecutor engaged in misconduct in using the gang evidence at trial. Although a prosecutor may be found to have engaged in misconduct by intentionally eliciting inadmissible evidence (see *People v. Smithey* (1999) 20 Cal.4th 936, 960), we do not see such misconduct in Hernandez's trial record. As we explained above, the gang evidence was admitted for a proper purpose.

Assuming that misconduct occurred in the use of some limited portion of the gang evidence, we are not persuaded to reverse. "Under the federal Constitution, a prosecutor commits reversible misconduct only if the conduct infects the trial with such '"unfairness as to make the resulting conviction a denial of due process."' [Citation.] By contrast, our state law requires reversal when a prosecutor uses 'deceptive or reprehensible methods to persuade either the court or the jury' [citation] and '"it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct"' [citation]." (*People v. Davis* (2009) 46 Cal.4th 539, 612.) In applying those standards, neither dictate reversal here.

## III. The "Excluded" Defense Evidence Issue

Hernandez contends his convictions must be reversed because the trial court erred in excluding evidence showing that one of the victims identified another person's photograph in a six-pack array as the shooter. We disagree.

After the shooting, LAPD Detective Joe Lumbreras prepared a six-pack array of photographs to show to victim Rudy D. The six-pack lineup included a photograph of Hernandez and a photograph of Luis C. At the hospital, Detective Lumbreras showed the six-pack to Rudy, and started asking him as to the photographs something to the effect, "Do you recognize this person?" When the detective pointed to Luis's photograph, Rudy made a "thumbs up" gesture.[8]

---

[8]     The context of the out-of-court identification from the six-pack was shown by statements from the lawyers. There was no evidentiary hearing.

During a break at Hernandez's trial, shortly before Detective Lumbreras took the stand to testify, Hernandez's trial counsel indicated to the court that the defense intended to question the detective about Rudy's identification of another person as the shooter as described above. The prosecutor objected that Rudy's out-of-court identification was inadmissible hearsay, and that the evidence should be excluded under Evidence Code section 352 because delving into the matter would be more prejudicial, time consuming and confusing than probative. The trial court ruled that the evidence inadmissible.[9]

*The Governing Law*

Hearsay evidence has two elements. It is evidence of a statement that was made other than by a witness while testifying in court, "that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) "Except as provided by law, hearsay evidence is inadmissible." (Evid. Code, § 1200, subd. (b).)

Hernandez acknowledges that Rudy's "thumbs up" gesture in the hospital in response to Detective Lumreras's act of pointing at a photograph was a "statement that was made other than by a witness while testifying in court." Rudy's thumbs up gesture amounted to a statement to the effect, "That's the guy who shot me." Hernandez also agrees that Rudy's out-of-court statement was offered to prove the truth of the matter stated. As Hernandez states in his opening brief on appeal: "[T]he evidence of the identification of Luis C[.] was relevant evidence of third-party culpability, capable of raising a reasonable doubt of . . . guilt . . . ." The only issue, therefore, is whether the evidence of Rudy's out-of-court statement was admissible "as provided by law."

Hernandez argues the evidence of Rudy's out-of-court statement was admissible as a spontaneous statement under Evidence Code section 1240. Section 1240 reads:

"'Evidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made

---

[9] The trial court had disqualified Rudy from testifying at trial after his neurologist testified that Rudy had suffered brain damage in the shooting, that he had recurrent seizures, and that testifying would create a risk of causing a seizure.

18

spontaneously while the declarant was under the stress of excitement

caused by such perception.'"

"A spontaneous statement is one made without deliberation or reflection. [Citation.] 'The crucial element in determining whether a declaration is sufficiently reliable to be admissible under this exception to the hearsay rule is . . . the mental state of the speaker. The nature of the utterance — how long it was made after the startling incident and whether the speaker blurted it out, for example — may be important, but solely as an indicator of the mental state of the declarant.' [Citation.]" (*People v. Raley* (1992) 2 Cal.4th 870, 892-893 (*Raley*).)

Whether a statement was a spontaneous statement admissible under Evidence Code section 1240 is "largely a question of fact." (*People v. Poggi* (1988) 45 Cal.3d 306, 318.) The determination of the question for purposes of admissibility is vested in the trial court, not the jury. (*Ibid.*)[10] The trial court necessarily exercises an element of discretion in determining the facts. (*Ibid.*) On appeal, a trial court's decision ruling to admit or exclude evidence as a spontaneous statement is reviewed for abuse of discretion. (*People v. Phillips* (2000) 22 Cal.4th 226, 236.) A court abuses its discretion when its decision is arbitrary or beyond the bounds of reason; a factual determinations that is not supported by substantial evidence falls within this framework. (*Ibid.*)

We find the evidence supports the trial court's determination that Rudy's out-of-court identification statement was not spontaneous. First, he made the statement well after the shooting. Although we do not see specific times stated in the record, we know that a period of time had passed since the shooting to allow for Rudy to be transported to the hospital, and for Detective Lumbreras to have prepared a six-pack. A measureable period of time ensued between the shooting and the statement. Although it is true that no mechanically applied time-link required between an event and statement for a statement to qualify as spontaneous under the Evidence Code (see, e.g., *Raley, supra,* 2 Cal.4th at pp. 892-893 [victim statement almost 20 hours after rape, but made immediately after

---

**10** The credibility of the statement ultimately remains with the jury or other trier of fact.

victim found in ravine, essentially to first rescuers she encountered after the attack]), there is no indication that Rudy spoke when he was first able to do so. This brings us to second, related aspect of Rudy's identification statement. Rudy did not "spontaneously" make his statement. He did not walk into a police station, independently see a person's photograph on a wanted poster, and begin pointing and identifying. On the contrary, he made the statement in response to "questions" posed by Detective Lumbreras — who pointed to photographs in the six-pack to obtain an identification. Rudy's statement was a thought-about, out-of-court identification, not subject to testing by cross-examination in court. As a result, the evidence was inadmissible hearsay, not subject to the spontaneous statement exception.

## IV.     The Defense Closing Argument Issue

Hernandez contends his convictions must be reversed because the trial court abused its discretion in limiting the defense's closing argument. We disagree.

Before closing argument, Hernandez's counsel requested to argue in his closing about famous cases of misidentification. Hernandez's counsel indicated that he did not want a disruption during argument, and requested an opportunity to provide case authority to the trial court before argument, supporting his intention to discuss other criminal cases where there had been misidentifications. The court agreed to review any materials submitted before argument began. Defense counsel sought to make reference to cases such as the "Father Pagano" case which had been the subject of a movie, and the "Linell Jeeter" case which had been the subject of a 60 Minutes story. Defense counsel also wanted to make reference to comments by United States Supreme Court Justice Felix Frankfurther on the subject of eyewitness identification, and to news stories in general about people in prison being exonerated by DNA evidence later developed by the "Innocence Project." The trial court directed defense counsel not to "make reference to so-called notorious cases by name or by issue. . . ." The court ruled that counsel could "argue about misidentification [generally]. . . . But we are not going to get into discussions about notorious cases which involve hearsay and . . . undue time consumption. . . ."

20

*The Governing Law*

The defense's closing argument "is a basic element of the adversary factfinding process in a criminal trial" and the complete denial of an opportunity to make a closing argument is a violation of the constitutional right to counsel. (*Herring v. New York* (1975) 422 U.S. 853, 858-859, 863 (*Herring*).) In the same vein, a defendant's right to counsel is denied when a trial court seriously limits defense closing argument, as by precluding reference to an entire theory of defense (*Conde v. Henry* (9th Cir. 1999) 198 F.3d 734, 739) or by not allowing counsel to argue the significance of evidence critical to a theory of the defense (*U.S. v. Kellington* (9th Cir. 2000) 217 F.3d 1084, 1099-1100).

At the same time, a trial court is not wholly precluded from governing closing argument. "The presiding judge must be and is given great latitude in controlling the duration and limiting the scope of closing summations. He [or she] may limit counsel to a reasonable time and may terminate argument when continuation would be repetitive or redundant. He [or she] may ensure that argument does not stray unduly from the mark, or otherwise impede the fair and orderly conduct of the trial. In all these respects he [or she] must have broad discretion. [Citations.]" (*Herring*, *supra*, 422 U.S. at p. 862; and see also *People v. Holloway* (2004) 33 Cal.4th 96, 137.) Counsel's argument to the jury "'must be based solely upon those matters of fact of which evidence has already been introduced or of which no evidence need ever be introduced because of their notoriety as judicially noticed facts.' [Citations.] He may state matters not in evidence that are common knowledge, or are illustrations drawn from common experience, history, or literature. [Citations.]" (*People v. Love* (1961) 56 Cal.2d 720, 730, disapproved on other grounds in *People v. Morse* (1964) 60 Cal.2d 631, 637, fn. 2.)

But the trial court retains discretion pursuant to section 1044[11] to limit counsel's argument under the circumstances of each case. (See *People v. London* (1988) 206

---

[11] Section 1044 provides: "It shall be the duty of the judge to control all proceedings during the trial, and to limit the introduction of evidence and the argument of counsel to relevant and material matters, with a view to the expeditious and effective ascertainment of the truth regarding the matters involved."

Cal.App.3d 896, 909.)  Counsel "may not dwell on the particular facts of unrelated, unsubstantiated cases." (*People v. Mendoza* (1974) 37 Cal.App.3d 717, 725 [trial court properly precluded defendant's counsel from reading newspaper clipping about unrelated crimes, which constituted hearsay material that could only confuse jury with irrelevant facts]; see also *People v. Sanders* (1995) 11 Cal.4th 475, 554-555 [trial court properly precluded references to the "notorious but unrelated" Charles Manson case, but allowed defense counsel to argue in general terms that there were "'worse cases'" than the defendant's in terms of number of victims and nature of crime]; *People v. Pelayo* (1999) 69 Cal.App.4th 115, 122 [trial court properly restricted defense counsel's closing argument by prohibiting references to newspaper articles about individual who was acquitted of sex crimes against children when it discovered children fabricated their stories].)

*Analysis*

We find the trial court did not abuse its discretion nor improperly impede Hernandez's constitutionally guaranteed fair trial and assistance of counsel rights by restricting closing argument in the manner the court did.  As the cases teach, a defendant does not have an absolute constitutional right to present closing argument of the kind and scope that the defendant desires.

At Hernandez's trial, the court precluded defense counsel from referring to certain historical cases of misidentification during closing argument.  In so doing, the court had concerns about counsel engaging in a continuous loop of presentations concerning unrelated cases of proper identification cases and misidentification cases that would confuse the jury and cause undue delay by requiring discussion of the specific facts of each.  The court also did not want to create trials within a trial that would result because the "notorious" cases which Hernandez wanted to discuss might well not have been within the common knowledge of the jurors.[12]  It is difficult to make meaningful comparisons with other crimes and cases, even when well publicized, without knowing

---

[12]     To be frank, we confess no memory of the Pagano and Jeeter cases.

22

the specific circumstances of such cases. (*People v. Roybal* (1998) 19 Cal.4th 481, 529; *People v. Marshall* (1996) 13 Cal.4th 799, 854-855.) All of these concerns expressed by the trial court were legitimate.

In addition, the court did not come close to foreclosing defense counsel from arguing misidentification. The court permitted defense counsel to argue the witnesses misidentified Hernandez by any other lawful manner apart from reference to other cases. Defense counsel did so by arguing that eyewitnesses are "often mistaken," After considering all circumstances, we find no abuse of discretion or denial of the right to counsel or to present a defense or to a fair trial by the court's limits on argument.

But, even assuming the court erred in limiting closing argument, we would not reverse even under the heightened standard of *Chapman v. California* (1967) 386 U.S. 18, 24. Hernandez's trial would not have been any different had his defense counsel been allowed to refer to the Pagano and Jeeter cases. We are amply satisfied that the jury would not have decided Hernandez's case any differently had the jurors heard mention of two or three separate, "notorious" cases of misidentification. The jury plainly knew of the misidentification issue in Hernandez's case, and could evaluate the issue based on the actual case presented to it at Hernandez's trial.

## V.     Sentence

Hernandez contends his sentence of 50 years to life violates the ban on cruel and or unusual punishment under the state and federal constitutions. His arguments implicate the factor of his age at the time he committed his crimes (14 years 11 months). We find no state or federal constitutional violation in Hernandez's sentence.

Article I, section 17 of the California Constitution prohibits cruel or unusual punishment. In *In re Lynch* (1972) 8 Cal.3d 410 (*Lynch*), our Supreme Court held a punishment may violate the California Constitution "if, although not cruel or unusual in its method, it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*Id*. at p. 424.) Under *Lynch*, there are three separate prongs of analysis: (1) the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society; (2) a

23

comparison of the challenged penalty with punishments prescribed in the same jurisdiction for different, more serious offenses; and (3) a comparison of the challenged penalty with punishments prescribed for the same offense in other jurisdictions. (*Id*. at pp. 425-427, fn. omitted.)

The federal constitutional standard is similar to the state constitutional standard. The Eighth Amendment to the United States Constitution, applicable to the states by the Fourteenth Amendment, prohibits cruel and unusual punishment. Under the federal constitutional examination, a sentence may be cruel and unusual when it is grossly disproportionate to the defendant's crime. (See, e.g., *Solem v. Helm* (1983) 463 U.S. 277 (*Solem*); *Harmelin v. Michigan* (1991) 501 U.S. 957.) In determining whether crime and sentence are unconstitutionally disproportionate, courts are required to must evaluate certain objective criteria including the seriousness of the offense, the penalty imposed, the sentences imposed on others who have committed the same or similar offenses in the same jurisdiction, and the sentences imposed in other jurisdictions for the same or similar offenses. (*Solem*, *supra*, 463 U.S. at p.292.)

Issues concerning juvenile offenders and lengthy sentences have been the subject of a number of recent state and federal court decisions. The United States Supreme Court in *Graham v. Florida* (2010) __ U.S. __ [130 S.Ct. 2011], held that a sentence of life in prison without the possibility of parole cannot be imposed upon a juvenile defendant for a nonhomicide offense without violating the Eighth Amendment. In *Miller v. Alabama* (2012) __ U.S. __ [132 S.Ct. 2455], the United States Supreme Court held that the Eighth Amendment prohibits mandatory sentencing schemes that require a term of life in prison without the possibility of parole for juvenile defendants convicted of homicide, without permitting the sentencing court any discretion to consider the offender's age, age-related characteristics, and the nature of the crime. (*Miller*, *supra*, 132 S.Ct. at p. 2465.)

In *People v. Caballero* (2012) 55 Cal.4th 262 (*Caballero*), our Supreme Court considered *Graham* and *Miller* in determining whether a juvenile's sentence violated the Eighth Amendment to the United States Constitution. In *Caballero*, the defendant was sentenced to 110 years to life for three counts of attempted murder; he had been 16 years

24

old when he committed his crimes. (*Id*. at p. 265.) Our Supreme Court noted that, in *Graham*, the United States Supreme Court ruled that the Eighth Amendment requires state courts to afford juvenile offenders a meaningful opportunity to be released based on demonstrated growth and maturity. In clarifying this standard, *Graham* relied on studies showing the fundamental differences between juvenile and adult minds, including behavior control, which continues to mature through late adolescence, and that juveniles are more capable of change than adults. (*Caballero*, *supra*, 55 Cal.4th at p. 266.) As the our Supreme Court further observed in *Caballero*: "*Graham* likened a life without parole sentence for nonhomicide offenders to the death penalty itself, given their youth and the prospect that, as the years progress, juveniles can reform their deficiencies and become contributing members of society." (*Ibid.*)

In *Caballero*, our Supreme Court also noted that *Miller* reiterated *Graham*'s focus on the "distinctive (and transitory) mental traits and vulnerabilities" of children, finding them applicable even in a robbery turned homicide situation. (See *Caballero*, *supra*, 55 Cal.4th at p. 267.) Our Supreme Court found that *Miller* clarified *Graham*'s "'flat ban'" on life-without-parole sentences in nonhomicide cases involving juvenile defendants, including sentences that amount to the "functional equivalent" of a term of life-without-parole sentence, as had been imposed in *Caballero*. (*Caballero*, *supra,* at pp. 267-268.) Based on its analysis of *Miller* and *Graham*, our Supreme Court held in *Caballero* that sentencing a juvenile offender for a nonhomicide offense to a specified term of years, with a parole eligibility date that falls outside the offender's own natural life expectancy, constitutes cruel and unusual punishment. (*Caballero*, *supra*, at p. 268.) The court reversed the defendant's sentence and remanded for resentencing in light of these principles.

Here, we consider the constitutionality of a sentence of 50 years to life on a defendant – 14 years old on the day of his crimes – who is convicted of first degree murder, four counts of attempted murder, and shooting at an occupied motor vehicle. While *Caballero* did not involve a juvenile who had been convicted of murder, our Supreme Court there did discuss the possibility of a murder sentence violating the Eighth

Amendment as follows:  "Although *Miller* concluded that *Graham*'s categorical ban on life without parole sentences applies only to all nonhomicide offenses, the court emphasized that in homicide cases, states are forbidden from imposing a '[m]andatory life without parole for a juvenile.'"  (*Caballero, supra*, 55 Cal.4th at p. 291, fn. 4.)  Our Supreme Court noted that mandatory sentences preclude consideration of a juvenile's chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences.  Such sentences also prevent taking into account the family and home environment that surround the juvenile—no matter how brutal or dysfunctional.  Our Supreme Court concluded: "Thus, in *Miller* the high court did 'not foreclose a sentencer's ability' to determine whether it was dealing with homicide cases and the '"rare juvenile offender whose crime reflects irreparable corruption."'  [Citations.]  The court requires sentencers in homicide cases 'to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.'  [Citation.]  We leave *Miller*'s application in the homicide context to a case that poses the issue."  (*Caballero*, *supra*, 55 Cal.4th at p. 268, fn. 4.)

This is such a case, and we find the punishment imposed on Hernandez is not unconstitutional, notwithstanding his age on the day he committed his crimes.  The sentencing judge was familiar with the cases we have outlined above.  The record makes clear that the court was diligent and thoughtful about their holdings, as well as their import and application to the facts of this case.  The court considered Hernandez's actions.  Specifically, Hernandez murdered Gary.  He also shot Rudy, destroying his quality of life and causing him to suffer from seizures that put his life in jeopardy.  Hernandez also shot Victor G., and shot at still others, all to benefit a criminal street gang.  The gravity of the offenses cannot be ignored.  Moreover, Hernandez's sentence is not the functional equivalent of life without the possibility of parole; he will be eligible for parole in his expected lifetime.

Hernandez faced a potential sentence far beyond the one imposed by the sentencing court, who expressly stated he was constrained by Eighth Amendment issues. Indeed, on each of counts 2 through 5, Hernandez could have been sentencing to an additional and consecutive 15 years to life, for an additional 75 years to life. Consecutive firearm enhancements of 25 years to life on counts 2 through 5 could also have been imposed, for an additional 100 years to life. As a result, Hernandez's potential sentence was 275 years to life. The able sentencing court knew he was required to impose a sentence that would not exceed Hernandez's life expectancy, because, as he noted, it "would not fulfill the constitutional requirements under the Eighth Amendment." The court also stated: "I want to make it clear. I believe without these cases that I would sentence the defendant as to counts 2, 3, and 4, to consecutive terms . . . . " Expounding, the court said, "I wanted very much to sentence Mr. Hernandez to consecutive terms because of [the] separate acts of violence committed against completely innocent people. He deserves it. I can't do it Constitutionally especially as regards to [Rudy], and that has kept me up at night."

We acknowledge Hernandez's youth at the time he committed the offenses, but his total sentence of 50 years to life is substantially less severe than the sentences in *Graham*, *Miller*, and *Caballero*. In addition, Hernandez's offenses were substantially more severe. Hernandez's sentence will not keep him in prison until he dies, without an opportunity to demonstrate his growth, maturity, and rehabilitation entitle him to release on parole. The trial court considered these factors. His sentence is not cruel and or unusual punishment under either the federal or state constitutions.

## VI.  Cumulative Error

Because we have found no reversible errors as discussed above, we reject Hernandez's argument that cumulative errors require reversal. (*People v. Watson* (2008) 43 Cal.4th 652, 705; *People v. Abilez* (2007) 41 Cal.4th 472, 523.)

## DISPOSITION

The judgment is affirmed.

BIGELOW, P. J.

We concur:

RUBIN, J.

GRIMES, J.